WADZINSKI and others, Appellants, vs. CITIES SERVICE OIL COMPANY, Respondent.*

*January 10—February 5, 1957.*

* Motion for rehearing denied, with $25 costs, on April 9, 1957.

For the appellants other than hereinafter noted there was a brief by *Peickert, Anderson & Fisher* of Stevens Point; for the appellant British American Insurance Company there was a brief by *Wolfe, O'Leary & Kenney* of Milwaukee; and for the appellant Central State Telephone Company there was a brief by *Reiland & Schmidt* of Wisconsin Rapids, and oral argument by *Clifford Peickert, H. O. Wolfe,* and *Donald E. Reiland.*

For the respondent there was a brief by *Toebaas, Hart, Kraege & Jackman* of Madison, attorneys, and *W. J. Conway* of Wisconsin Rapids of counsel, and oral argument by *Mr. W. L. Jackman* and *Mr. Conway*.

MARTIN, C. J. The creamery building was located on the northwest corner of an intersection in the village of Pittsville. A gasoline tank, capacity 385 gallons, was located underground at the southeast corner of the building about four feet from the building and 20 to 25 feet south of the nearest wall of the basement. Above the tank was a gasoline pump of the type used in filling stations, which metered the gasoline dispensed from it.

Beneath the northern part of the building there was a 40 by 20-feet partial basement with walls of cement block and stone. The creamery refrigeration system used methyl chloride, an explosive gas, as a coolerant for a brine tank in the basement and a 12 by 12-feet cooler located on the first floor.

The gasoline tank was in the ground since 1930. Between 1938 and 1946 the L. L. Bender Oil Company of Wisconsin Rapids supplied gasoline to the tank; from 1946 until sometime in 1951, after Wadzinski purchased the creamery, John Tomczak and his son, Donald, supplied it. In August of 1951 Cities Service purchased the Tomczak Oil Company and its assets, including the tank and pump at the creamery, and Donald Tomczak became the consignee of Cities Service. The understanding between Tomczak and Wadzinski was that if anything went wrong with the gasoline equipment Wadzinski was to notify Tomczak, who would have the defendant's serviceman fix it; and this was the practice followed.

The first question of the special verdict inquired: "Was the explosion on the morning of May 15, 1954, at the Pittsville Creamery a gasoline explosion?" and the jury answered, "No."

Question 3 of the special verdict inquired: "Was the defendant negligent in respect to ascertaining the condition of the underground storage tank prior to the explosion on May 15, 1954?" and the jury answered, "No."

We have studied the record carefully and are satisfied that the jury's answer to question 1 must stand. But assuming it had answered that question "Yes," it would be necessary to plaintiff's recovery that question 3 likewise be so answered. We appreciate plaintiffs' argument that the jury having found "No" on the first question, it necessarily found "No" on the third. In our opinion, however, it must be held as a matter of law that there was no negligence on the part of defendant in failing to ascertain the condition of the tank prior to the explosion, and the trial court should have directed the verdict on that question.

There is no dispute in the evidence on this question. Wadzinski's orders to Tomczak were that he keep the tank filled. Their agreement was that if anything went wrong with the gasoline equipment Wadzinski would notify Tomczak who would see that repairs were made; and this was done on a number of occasions when the pump, the meter, or the hose did not work properly. Tomczak lived less than a block from the creamery and it was easy to get in touch with him.

The gasoline pump and tank were maintained for the convenience of the plaintiffs who needed a supply for their five trucks. Only rarely, in cases of extreme need, was gasoline sold to the general public. Plaintiffs' truck drivers filled their trucks from the tank and turned in a slip stating the gasoline taken to Fredonna McLaughlin, Wadzinski's bookkeeper, whose responsibility it was to keep track of the gasoline supply.

When Tomczak's driver delivered gasoline he first measured the gas in the tank with a stick to see how much it needed and then filled it, leaving a slip with Miss McLaughlin

showing the number of gallons put in. Miss McLaughlin took the pump-meter reading every night and checked it against the slips for the day showing amounts put in and taken out. On occasion when she was short she checked with the drivers to see who had forgotten to turn in a slip. She never found any shortage of gasoline; she never had any occasion to become suspicious that gasoline was being lost from the tank; she never found any discrepancies between the separate invoices left by the defendant's driver and the bills sent from defendant's office at the end of the month.

No one ever smelled gasoline within the creamery building. Nothing was ever detected which made anyone question whether the tank leaked. Defendant was never notified of a shortage in gasoline or of any other circumstance which might have called for a testing of the tank.

Mr. I. F. Statz, supervisor of fire prevention for the safety division of the industrial commission, testified that the safety factor in the location of underground gasoline tanks is the distance required between the tank and the basement of adjoining buildings. It is conceded that the location of the creamery tank was in full compliance with the rules and regulations of the industrial commission, although it was placed there sometime previous to the adoption of such rules and regulations.

The tank was located at the creamery for at least twenty-four years before the explosion occurred. Mr. Statz testified that there is no set age at which a particular tank will leak and there is no practical test known to determine when a tank will leak prior to the time it begins to leak. He testified he had seen tanks removed that were in the earth for fifty years and had not leaked and others that leaked after two or three years. There is no order of the industrial commission limiting the time such tanks may be used and none requiring periodic testing of underground tanks. The testimony further

shows that it is not the practice of oil companies to apply tests for leakage unless a customer complains of shortages.

Mr. Statz took explosimeter tests of the creamery premises on the day following the explosion and found that an explosive material, later identified as gasoline vapor, was present in the soil. On the next day Mr. Statz's deputy took further tests with the same results and ordered the tank air tested. The air test indicated there was a leak in the tank.

When the tank was dug up it was found to be rusted and corroded and there were several holes in it, the largest of which probably leaked while in the ground according to the testimony of a University of Wisconsin metallurgist who examined it.

Plaintiffs failed completely to prove that defendant knew or should have known of the condition of the tank and should have made periodic tests thereof. The evidence shows that it did not, and would not (under the agreement), know of such condition and it is neither the practice nor the duty of the defendant to make periodic tests of the tank in the absence of complaint as to shortage of gasoline. Even if periodic tests had been made, the evidence is that no test would show when a particular tank would leak prior to the time it actually leaks.

The evidence is undisputed that the tank and pump were located at the creamery at the time Wadzinski purchased the premises and took possession. When defendant acquired the gasoline equipment Wadzinski's possession was in no way changed and the agreement as to supplying and servicing was continued as in the past—that defendant would keep the tank filled and would make repairs if notified by plaintiffs of the need therefor. There is no claim that the tank was defective either when installed or when defendant took title to it. The rule is stated in 8 C. J. S., Bailments, p. 260, sec. 25:

"It is the duty of the bailor not only to furnish an article free from defect when delivered, but also to inspect and repair it whenever called on to do so during the term of the hiring; but in the absence of notice, the bailor is not liable for injuries caused by defects arising subsequent to the delivery of the property to the bailee, unless he has expressly undertaken the duty of inspecting and repairing the property, and even then he is liable only to the bailee for breach of his contract, and hence, is not responsible to the servants of the bailee."

In order to charge anyone with negligence, it is necessary that he have knowledge of some duty to perform, and in order that an act or omission may be regarded as negligent, the person charged must have knowledge or should know from the circumstances brought to his attention that the act or omission involves danger to another. *Weber v. Interstate Light & Power Co.* (1955), 268 Wis. 479, 68 N. W. (2d) 39. There being no evidence that the defendant knew or should have known that the tank leaked; no evidence that it breached its contract with the plaintiffs; no evidence that it acted contrary to any accepted rules, regulations, or customs in servicing and maintaining the tank—it must be held as a matter of law that defendant was not negligent with respect thereto.

In view of our decision on negligence, other questions raised by plaintiffs become immaterial.

*By the Court.*—Judgments affirmed. Respondent's application for full costs granted.