BROWNE, Plaintiff in error, v. STATE, Defendant in error.*

*June 3—June 30, 1964.*

494

For the plaintiff in error there was a brief by *Gerald Powers,* attorney, and *Sherwood Slate* of counsel, both of Milwaukee, and oral argument by *Mr. Powers.*

For the defendant in error the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *George Thompson,* attorney general, *William A. Platz,* assistant attorney general, *William J. McCauley,* district attorney of Milwaukee county, and *Richard Surges,* assistant district attorney.

WILKIE, J. Four issues are raised on this review:
1. Is sec. 161.02 (3), Stats., unconstitutional in that it imposes cruel and unusual punishment in making it a crime

for a person to take or use narcotics not in pursuance to a prescription for permitted use?

2. Were the items of physical evidence improperly admitted against Browne because they were obtained as a result of an illegal search and seizure, the illegality of the search in turn being a result of an illegal arrest?

3. Were Browne's admissions improperly admitted into evidence against him?

4. Was the trial court's refusal of Browne's request to represent himself a *per se* denial of a state constitutional right, guaranteed by sec. 7, art. I, Wisconsin constitution?

### *Constitutionality of Criminal Conviction for Use of Unprescribed Narcotic Drugs.*

Sec. 161.02 (3), Stats., establishes three offenses involving the use of narcotics. It provides that no person shall take or use narcotic drugs (1) "habitually" or (2) "excessively" or (3) "except in pursuance to a prescription for permitted use as prescribed . . ." The latter offense embraces a single instance of use and it was with this offense that Browne was charged.

The defendant contends that to make a crime of such use of unprescribed narcotic drugs by a person who is addicted to the use of narcotics constitutes cruel and unusual punishment in violation of substantive due process within the meaning of the Fourteenth amendment of the United States constitution. He relies upon *Robinson v. California* [2] as the sole support for his argument.

*Robinson* is clearly distinguishable. The California statute that was held unconstitutional made it a crime to be a drug addict. Robinson came to California from Oregon and was charged with the status crime of being addicted to the use of narcotics. He was not charged with, nor was

---

[2] (1962), 370 U. S. 660, 82 Sup. Ct. 1417, 8 L. Ed. (2d) 758.

there any evidence offered of any particular incident of use of drugs either in California or otherwise. The United States supreme court, in reversing a judgment of conviction, stated, at page 666:

"This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there."

*Robinson* does not invalidate any state statute, such as sec. 161.02 (3), Stats., that makes it a crime for a person, whether an addict or not, to take and use narcotic drugs without a legal prescription. In the case at bar Browne was not charged with being an addict but with a specific act of taking and using drugs not pursuant to a prescription.

We must conclude that there is no merit to the defendant's contention that the statute is unconstitutional.

### Search and Seizure.

Whether the state police had probable cause to arrest a defendant and search him and his premises pursuant to that arrest, is a matter of federal constitutional law. "Probable cause" to arrest is a requirement of the Fourth amendment of the United States constitution, binding against the states through the Fourteenth amendment.[3] If an arrest is in-

---

[3] *Giordenello v. United States* (1958), 357 U. S. 480, 485, 78 Sup. Ct. 1245, 2 L. Ed. (2d) 1503; *Ker v. California* (1963), 374 U. S. 23, 83 Sup. Ct. 1623, 10 L. Ed. (2d) 726.

valid, a search incidental to that arrest is also improper and if evidence obtained by a search incidental to an illegal arrest is admitted into evidence and has a prejudicial effect upon the defendant's case, then Fourteenth amendment due process requires that a subsequent conviction must be reversed.[4] Conversely, if an arrest is valid, a search incidental to that arrest is proper and evidence obtained in that search may be received in evidence.

Our first attention must be directed to the federal constitutional law as to the legality of the arrest. Since sec. 11, art. I of the Wisconsin constitution is substantially like the Fourth amendment of the United States constitution, we have held that the standards and principles surrounding the Fourth amendment are generally applicable to the construction of sec. 11, art. I, and that a finding of probable cause under federal standards will normally result in a finding of probable cause under state standards.[5]

Probable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime.[6] While the standard is objective (good-faith belief by the officer is not sufficient), it is not necessary that the evi-

[4] *Mapp v. Ohio* (1961), 367 U. S. 643, 81 Sup. Ct. 1684, 6 L. Ed. (2d) 1081; *Fahy v. Connecticut* (1963), 375 U. S. 85, 84 Sup. Ct. 229, 11 L. Ed. (2d) 171.

[5] *State v. Cox* (1950), 258 Wis. 162, 45 N. W. (2d) 100; *State v. Phillips* (1952), 262 Wis. 303, 55 N. W. (2d) 384. For an example of police conduct permitted by the Fourth and Fourteenth amendments, U. S. Const., but prohibited by the state, compare *State v. Kroening* (1956), 274 Wis. 266, 79 N. W. (2d) 810, 80 N. W. (2d) 816, with *Breithaupt v. Abram* (1957), 352 U. S. 432, 77 Sup. Ct. 408, 1 L. Ed. (2d) 448.

[6] "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States* (1959), 361 U. S. 98, 102, 80 Sup. Ct. 168, 4 L. Ed. (2d) 134. See also *Carroll v. United States* (1925), 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543.

dence be sufficient to prove ultimate guilt beyond a reasonable doubt, or even that it be sufficient to prove that guilt is more probable than not. It is only necessary that the information lead a reasonable officer to believe that guilt is more than a possibility. Moreover, the belief may be predicated in part upon hearsay information.[7]

Assuming a valid arrest predicated upon probable cause (with or without an arrest warrant),[8] the police may, without a search warrant, conduct a search of the person in order to protect themselves,[9] and they may also search premises immediately under his control if there is also probable cause to believe the search will reveal evidence and instrumentalities of the crime for which the arrest was made.[10] In *Harris,* the defendant was arrested on a check-forgery charge. It was reasonable under the circumstances to believe that documentary instrumentalities of the crime were present in his apartment. That a search of the four-room apartment revealed forged draft cards, the offense for which he was ultimately convicted, did not alter the legality of such search, given the legality of the arrest and the probability of discovering instrumentalities of check forgery at the time of arrest. In *Rabinowitz* the defendant was arrested for forgery of stamps. Under the circumstances, it was probable that instrumentalities of the crime were in his

---

[7] *Draper v. United States* (1959), 358 U. S. 307, 79 Sup. Ct. 329, 3 L. Ed. (2d) 327.

[8] Ibid.

[9] *Harris v. United States* (1947), 331 U. S. 145, 67 Sup. Ct. 1098, 91 L. Ed. 1399; *Preston v. United States* (1964), 376 U. S. 364, 84 Sup. Ct. 881, 11 L. Ed. (2d) 777; *Stoner v. California* (1964), 376 U. S. 483, 84 Sup. Ct. 889, 11 L. Ed. (2d) 856.

[10] *Harris v. United States, supra; United States v. Rabinowitz* (1950). 339 U. S. 56, 70 Sup. Ct. 430, 94 L. Ed. 653; *Abel v. United States* (1960), 362 U. S. 217, 80 Sup. Ct. 683, 4 L. Ed. (2d) 668; *Preston v. United States, supra; Stoner v. California, supra.*

office, the site of the arrest. A search of the office revealed such stamps, and was held to be a legal search pursuant to a valid arrest. In *Abel* the defendant was arrested pursuant to an administrative warrant, as a deportable alien. A search of the premises for proof of alien status was held to be a reasonable search, pursuant to a valid arrest.

To be distinguished from these circumstances is the case in which a policeman validly arrests a person for vagrancy, takes him into custody, and then sometime later searches his impounded automobile. Under these circumstances, the United States supreme court has held that the search, even though following upon a valid arrest, was too remote in time and place to be deemed reasonably incidental to such arrest.[11] Moreover, such a search of an automobile is not likely to reveal evidence of the status crime of vagrancy.

We now apply these principles to the case at hand. When the vice-squad officers observed Browne seize a hypodermic needle and syringe lying next to him on the bed and throw the paraphernalia on the floor, this observation, coupled with their knowledge of his prior drug offenses, gave them probable cause to believe that he was violating sec. 161.02 (3), Stats. From their experience as vice-squad officers, these men could reasonably conclude that possession of this paraphernalia was correlated with an illegal use of drugs. Sec. 161.02 (3) provides, in part, that possession of a "hypodermic syringe or needle . . . shall be prima facie evidence of the unlawful use of such drugs." If possession of such instrumentality is legally sufficient evidence of guilt, *a fortiori,* the officers had "probable cause" to arrest because "probable cause" denotes a lesser quantum of evidence than legally sufficient evidence to convict.

Under these circumstances "probable cause to arrest" also supports a determination of probable cause to believe

---

[11] *Preston v. United States, supra.*

that evidence and instrumentalities of the crime are within the immediate control of the person arrested. General police experience reveals that most illegal users of narcotics maintain either the drugs or the instrumentalities in use in their rooms, apartments, and homes. Therefore, a search pursuant to a valid arrest under these circumstances was reasonable.[12]

To make the arrest valid and the search incidental to the arrest reasonable, it is also necessary to determine whether there was any violation of constitutional rights on the part of the police in entering the building and proceeding to the upstairs kitchen. To say that as long as probable cause appears at any time during the course of the police conduct the arrest is valid would be to permit the police to enter every home in the community as a part of a general dragnet operation and make observations, and then if such observations yielded sufficient evidence of probable cause, execute "valid" arrests. This would defeat the values which the Fourth amendment and sec. 11, art. I, seek to protect.

At the moment the officers entered the kitchen they lacked probable cause to arrest. To arrest for probable cause, upon an informer's tip alone, requires that the informant be known to the police, and that the police from their own direct knowledge know the informant to be reliable.[13] Moreover, even if the police know from personal knowledge that the alleged offender has committed similar crimes in the past, they must still be able to attest from their own knowledge to the informer's reliability.[14] These officers, although they previously knew of Browne's use of narcotics, did not even know the identity of the informant and certainly could not attest to his reliability.

---

[12] *Harris v. United States, supra; United States v. Rabinowitz, supra; Abel v. United States, supra.*

[13] *Draper v. United States, supra.*

[14] *Jones v. United States* (1960), 362 U. S. 257, 80 Sup. Ct. 725, 4 L. Ed. (2d) 697.

But because the officers lacked probable cause to arrest, it does not follow that they were not legally permitted to be in the kitchen.

Certainly the police may investigate claims of crime on evidence not sufficient to justify an arrest. The anonymous tip, coupled with their previous knowledge of Browne's narcotics offenses, justified their trip to his house to investigate for the purpose of gathering evidence sufficient to arrest. When they followed Browne's fellow roomer who conducted them from the front door to the kitchen they were continuing to make a reasonable investigation of the crime concerning which they still had a reasonably aroused suspicion. Although both the Fourth amendment and sec. 11, art. I, protect against police invasion of personal privacy, police officers should be permitted to conduct a reasonable investigation when their suspicion has been reasonably aroused. Whether an inquiry is considered reasonable must depend upon the facts in each case and must turn on the application of what is essentially an indeterminate and flexible test.

We do not think it is helpful in making a determination as to the validity of the investigation to consider whether or not the defendant "consented" (actual or implied) to his landlord or fellow roomer to let the police in and to guide them to the threshold of his second-floor room. Since criminal convictions require substantial evidence, the police must be given reasonable power to gather probative evidence. These two values conflict (personal privacy and the need for probative evidence), and in our system of government the difficult task of striking a satisfactory balance falls upon courts. Do trips through the technicalities of the law of trespass aid in the balancing task? The United States supreme court has recognized that they do not. In *Jones v. United States, supra,* the court in determining the scope of standing to raise Fourth amendment issues, in its search

for reasoned standards, was "persuaded . . . that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, . . . has been shaped by distinctions whose validity is largely historical." [15] Very recently, in determining whether a search of defendant's hotel room, without a search or arrest warrant, was reasonable because a desk clerk gave the officers authority to enter the room, the court stated:

"Nor is there any substance to the claim that the search was reasonable because the police, relying upon the night clerk's expressions of consent, had a reasonable basis for the belief that the clerk had authority to consent to the search. Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.' " [16]

Thus, whether or not a search or investigation is reasonable is not a matter for the application of the comparatively rigid rules of tort and property law,[17] but is rather a matter of an inquiry as to whether the search or investigation is constitutionally reasonable under the circumstances. If police conduct is not considered unreasonable in the circumstances, it is not made unreasonable if it is deemed to have involved a civil trespass.

In the case at bar, and considering the nature of the crime involved, the police conduct in presenting themselves at the rooming house after receiving the phone call, in identifying themselves as police officers, in being ushered by

[15] 362 U. S. at page 266.
[16] *Stoner v. California, supra,* at page 488.
[17] Traynor, Mapp v. Ohio at Large in the Fifty States, Duke Law Journal (1962), 319, 336, 337.

the fellow roomer to the kitchen, in asking as to the where-abouts of Browne, and in viewing him through the open door, constituted a reasonable investigation on the part of the police officers that warranted any invasion of privacy Browne suffered from having the officers brought to the threshold of his room without his affirmative consent.

In conclusion, because the police conduct in conducting an investigation seeking evidence to establish "probable cause" was on balance reasonable, and because the investigation did produce probable cause to believe Browne was violating sec. 161.02 (3), Stats., before the arrest, such arrest was validly executed. Because the search pursuant to the arrest was reasonable under the circumstances of this case, the physical evidence seized pursuant to the search was properly admitted into evidence against Browne.

### Browne's Admissions.

In *Wong Sun v. United States* [18] the United States supreme court held that if a person's arrest was constitutionally invalid, any prejudicial admissions made after arrest and before arraignment must be excluded from evidence as a matter of due process. Because Browne's arrest was constitutionally valid, his admissions were properly admitted into evidence.

### Refusal to Permit Browne to Represent Himself.

Defendant had three attorneys who represented him *in tandem* at different stages in the proceedings below, from the time of his arraignment (June 18, 1962) to the time of sentencing (March 14, 1963). He often quarreled with his counsel in open court and repeatedly expressed dissatisfaction with each. Although represented by counsel, on several

---

[18] (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. (2d) 441.

occasions he engaged in running colloquies with the trial court.

At the beginning of the actual trial Browne requested that he be allowed to represent himself and counsel called the court's attention to the fact that Browne wanted to terminate his services. The trial court then stated that the attorney had been appointed on the specific request of Browne, that the court was satisfied that counsel was prepared, and that the appointment stood.

Defendant contends that the trial court's refusal of Browne's request to represent himself was a *per se* denial of a state constitutional right, guaranteed by sec. 7, art. I, Wisconsin constitution.

True, in *Dietz v. State* [19] this court held that the right to counsel, under sec. 7, art. I of the Wisconsin constitution included the flat right "to be heard 'by himself' as well as by counsel." Therefore, the court concluded that if a person was "mentally competent," he must be permitted to represent himself in a criminal prosecution, if that is his desire.

However, this general principle must be modified in the light of subsequent development of constitutional doctrine, state and federal, relating to the right to counsel. Presently, an indigent defendant has a flat state and federal constitutional right to state-appointed-and-financed counsel in all prosecutions for serious offenses in which a substantial penalty might be imposed.[20]

Moreover, a body of constitutional law, both state and federal, has developed to determine whether or not a defendant has intelligently and understandingly waived his right to counsel. This question is an objective determination of law made by the court based upon an evaluation of

---

[19] (1912), 149 Wis. 462, 479, 136 N. W. 166.

[20] *State ex rel. Drankovich v. Murphy* (1946), 248 Wis. 433, 22 N. W. (2d) 540; *State ex rel. Burnett v. Burke* (1964), 22 Wis. (2d) 486, 126 N. W. (2d) 91; *Gideon v. Wainwright* (1963), 372 U. S. 335, 83 Sup. Ct. 792, 9 L. Ed. (2d) 799.

three general factors: (1) The ability of the defendant to appreciate his circumstances,[21] (2) the complexity of the charges he faces,[22] and (3) the role of the trial court in apprising the defendant of his circumstances.[23]

Because of the evolution of the law as to *waiver,* some modification of *Dietz* is required. In *Dietz,* the court did not focus upon the waiver problem. Because Dietz was, in fact, permitted to represent himself, the only issue as the court viewed the problem was whether or not he conducted a competent defense.

Here, where the court denied a defendant's request to represent himself, the relevancy of the waiver doctrine to the *Dietz* principle is seen more clearly. The fundamental purpose of the right to counsel is to insure reliable guilt determination. It is clear that as a general proposition, a defendant's position is more secure if represented by counsel. But, due process also requires that throughout the criminal process the state must treat a defendant as a person possessing human dignity (after all it is the defendant who is going to suffer if he makes the wrong decision and forgoes a

[21] *Moore v. Michigan* (1957), 355 U. S. 155, 78 Sup. Ct. 191, 2 L. Ed. (2d) 167. A seventeen-year-old boy, of below-average intelligence, could not appreciate significance of first-degree murder charge. See also *State ex rel. Burnett v. Burke, supra.* Defendant's I. Q. was between 75 and 91.

[22] *Von Moltke v. Gillies* (1948), 332 U. S. 708, 68 Sup. Ct. 316, 92 L. Ed. 309; an educated woman held not to have intelligently waived counsel in relation to a charge of conspiracy to commit espionage in circumstances where her legal relationship to active conspirators was a matter requiring technical knowledge of the law of conspiracy.

[23] *Von Moltke v. Gillies, supra; State ex rel. Burnett v. Burke, supra.* To aid trial courts in determining whether or not a defendant has intelligently waived counsel, this court has set forth a series of inquiries to be made of the defendant by the trial court, and outlined information that the court should supply to the defendant before concluding that he has waived, and before accepting a guilty plea from an unrepresented defendant. See *State ex rel. Burnett v. Burke, supra,* at page 494.

lawyer) and, in most instances, a defendant would be denied this treatment if counsel were imposed upon him against his wishes.

However, in approaching the problem of waiver, it is highly important to consider that many persons lack the capacity to evaluate intelligently their circumstances during the course of a criminal prosecution.

In determining whether a defendant who was represented by counsel appointed by the trial court on the specific request of the defendant was denied his constitutional right to act as his own counsel, the critical question is not whether, as a matter of law, he lacked the capacity intelligently to waive his counsel. Rather, the critical question is whether, under the circumstances, the trial court had reasonable grounds for a good-faith belief that the defendant lacked the capacity to appreciate his circumstances and thus to conduct his own defense and to waive intelligently his right to counsel. The determination of intelligent waiver is a matter of law (or constitutional fact) which this court may independently determine, giving very careful consideration to the determinations made by the trial court,[24] and applying the legal standards outlined above. Where the trial court, as in the case at bar, concludes that the defendant lacked the *capacity* to intelligently waive, then it would be unreasonable to reverse the conviction solely because this court determined that the defendant possessed the capacity to waive.

In the instant case, the trial court had grounds for a "good-faith" belief that Browne lacked the capacity to intelligently waive:

(1) After his initial counsel had moved to suppress admission of physical evidence on constitutional grounds, and the motion had been denied, Browne wanted him dis-

---

[24] *Moore v. Michigan, supra; State ex rel. Burnett v. Burke, supra.*

missed because he was "incompetent." Surely a motion to suppress under the circumstances of this case was an intelligent strategy. The fact that Browne deemed his attorney "incompetent" after this move is evidence that Browne did not appreciate the realities of a criminal prosecution.

(2) Later, Browne demanded that his second counsel be dismissed because he did not know the chemical composition of paregoric, or whether paregoric was a narcotic drug. Surely, in the posture of this case, whether or not paregoric was a narcotic drug was not a meaningful issue. Ch. 161, Stats., specifically labels paregoric as a narcotic drug.[25] Browne's interrogation of his counsel on this issue is evidence of a lack of appreciation of the issues in the litigation.

(3) When requesting dismissal of his third counsel, who tried the case, Browne argued that he wanted to introduce certain lines of evidence, but his counsel refused. However, this evidence went to the legality of the arrest, a matter already resolved and not relevant to the issues at the trial to the jury.

We conclude that the trial court had reasonable grounds for a good-faith belief that Browne lacked the capacity to appreciate his circumstances, and properly denied Browne's request to represent himself.

*By the Court.*—Judgment affirmed.

DIETERICH, J., took no part.

*On motion for rehearing:*

For the plaintiff in error there was a brief by *Jackson M. Bruce, Jr.,* and *Norman L. Winn* of counsel, both of Milwaukee.

For the defendant in error there was a brief by *George Thompson,* attorney general, *William A. Platz* and *Betty R. Brown,* assistant attorneys general.

---

[25] Sec. 161.06 (1) (c), Stats.

The following opinion was filed November 12, 1964.

PER CURIAM (*on motion for rehearing*). Subsequent to our original opinion herein defendant Browne moved for rehearing and different counsel were appointed by this court to represent him with respect to such motion. We consider seriatim the issues raised in the brief filed in support of this motion for rehearing:

### *Is Paregoric a Narcotic Drug?*

For the first time in this criminal prosecution the claim is advanced that paregoric is not a narcotic drug within the meaning of sec. 161.02 (3), Stats., under which defendant was convicted. This statute provides in part: "No person shall take or use narcotic drugs habitually or excessively or except in pursuance to a prescription for permitted use as prescribed in this chapter." Sec. 161.01 (14) defines narcotic drugs, as used in ch. 161, Stats., so as to include any compound containing opium. A licensed pharmacist testified that the component parts of paregoric are opium, alcohol, benzoic acid, and oil of anise.

Sec. 161.06 (1) (a) and (b), Stats., authorizes an apothecary to dispense narcotic drugs upon prescription under certain restrictions. Sub. (c) of sec. 161.06 (1) then provides, "The provisions of this subsection shall apply to paregoric." Defendant bases his contention that paregoric is not a narcotic drug within the meaning of sec. 161.02 (3), upon this latter specific mention of paregoric in the subsection relating to apothecaries filling prescriptions for narcotic drugs, and argues that the canon of statutory construction, *expressio unius est exclusio alterius*, applies.

We reject this contention of defendant since we are satisfied that the specific provision of sec. 161.06 (1) (c), Stats.,

was inserted by the legislature for purposes of emphasis because paregoric is frequently among the exempt narcotic preparations listed in the statutes of other states and in the Harrison Narcotics Act. It serves as an express warning to pharmacists that they may only dispense paregoric pursuant to prescription. The definition which controls is that of sec. 161.01 (14), and that clearly includes paregoric.

*Instruction With Respect to Hypodermic Needle.*

Also for the first time on this rehearing defendant complains of the following instruction included in the trial court's charge to the jury:

"Under the law applicable to this case, the conscious possession of a hypodermic syringe or needle is prima facie evidence of the unlawful use of narcotic drugs."

This instruction is predicated upon the second sentence of sec. 161.02 (3), Stats., which reads, "The unlawful possession of narcotic drugs by a person or of a hypodermic syringe or needle, except when possessed by a diabetic, shall be prima facie evidence of the unlawful use of such drugs." Since statutes, if possible, must be given a reasonable meaning and not one which accomplishes an absurd result, we hold the word "unlawful" does not qualify the possession of a hypodermic syringe or needle. The only unlawful possession of such an instrument would be one obtained by theft, and clearly the legislature was not here concerned with stolen property.

Defendant attacks this statutory provision as being invalid on the ground that all statutory presumptions in criminal prosecutions have been held unconstitutional in *Tot v. United States* (1943), 319 U. S. 463, 63 Sup. Ct. 1241, 87 L. Ed. 1519, and *Barrett v. United States* (5th Cir. 1963), 322

Fed. (2d) 292. The state counters with the argument that only those statutory presumptions are invalid where there is no rational connection between the fact proved and the ultimate fact presumed. Here there clearly is a rational connection between possession of a hypodermic syringe or needle by a nondiabetic and the unlawful use of narcotic drugs.

We find it unnecessary to pass on the constitutionality of this statutory provision. Even if it were error for the trial court to have given the instruction predicated upon the statute, we determine it to have been nonprejudicial. The uncontradicted testimony that there were recent hypodermic needle marks on defendant's arms; his admissions that he was taking paregoric; and the manner in which he admitted he prepared it for injection by use of heat so as to burn off the alcohol and secure a higher concentration of opium; render it highly unlikely that this instruction had any material bearing on the jury finding defendant guilty.

Another reason for our determination not to reverse because of the giving of the quoted instruction is that no motion for new trial was made in this case. Error cannot be predicated upon an instruction to the jury without first moving for a new trial on this ground in the trial court. *Ferry v. State* (1954), 266 Wis. 508, 510, 63 N. W. (2d) 741; *State v. Biller* (1952), 262 Wis. 472, 482, 55 N. W. (2d) 414.

### *Refusal of Trial Court to Permit Defendant to Waive Counsel.*

Defendant again raises the issue that the trial court denied him the constitutional right to try his own case without counsel. This issue was exhaustively argued by the parties and thoroughly considered by our court at the time we rendered our original opinion. Our reasons for rejecting this contention were fully set forth therein, and we deem it unnecessary to add to what was there stated.

*Defendant's Admissions Before Trial.*

In addition to the arguments originally advanced before this court in support of the contention that defendant's admissions before trial to police officers should have been excluded, defendant now relies upon *Escobedo v. Illinois* (1964), 378 U. S. 478, 84 Sup. Ct. 1758, 12 L. Ed. (2d) 977. It is contended that this case requires that any such admission be excluded from evidence in the absence of (1) either representation by counsel before making such admissions or the intelligent waiver of counsel; and (2) the police officers informing defendant of his constitutional right to remain silent and not say anything in response to questions. A careful reading of *Escobedo* convinces us that it does not lay down any such sweeping strictures. At the beginning of the *Escobedo* majority opinion, Mr. Justice GOLDBERG stated the issue to be decided (378 U. S., at p. 479) :

"The critical question in this case is whether, *under the circumstances,* the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon v. Wainwright,* 372 U. S. 335, 342, and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation." (Emphasis supplied.)

The pertinent circumstances in that case were that during the interrogation after Escobedo's arrest he repeatedly asked to speak to his lawyer and such request was denied; his lawyer came to the police station and asked the officer in charge for permission to see Escobedo; this also was denied; and the police never advised Escobedo of his constitutional right to remain silent. The only similarity between those facts and

the facts present here is that defendant Browne was not advised of his constitutional right to remain silent. He made no request to consult with an attorney nor did any attorney seek to confer with him. We deem that this fully distinguishes *Escobedo* and that it does not control the result here.

With respect to the failure to advise defendant of his constitutional right to remain silent, *Holt v. State* (1962), 17 Wis. (2d) 468, 479, 117 N. W. (2d) 626, held that there is no hard-and-fast rule that an accused must be informed of his constitutional right not to incriminate himself as a condition precedent to admission into evidence of any admissions or confessions made to the police. The most that *Escobedo* holds in this respect is that the failure to so inform a criminal suspect under arrest, when coupled with other circumstances, may be sufficient to require exclusion of any admission made by him. We find here a total lack of any other circumstances which require exclusion of the instant admissions.

### New Trial in the Interest of Justice.

As a final argument defendant requests that we order a new trial in the interest of justice. We are not convinced that the conviction of defendant probably resulted in a miscarriage of justice. We decline, therefore, to order a new trial on that ground.

The motion for rehearing is denied without costs.