STATE OF IOWA, appellee, v. JAMES LEWIS HOLLAND, appellant.

No. 51713.

(Reported in 138 N.W.2d 86)

NOVEMBER 16, 1965.

Burton E. Parriott, of Remsen, for appellant.

Lawrence F. Scalise, Attorney General, Don R. Bennett, Assistant Attorney General, and William S. Sturges, of Le Mars, County Attorney, for appellee.

GARFIELD, C. J.—Defendant, age 25, was indicted for the murder of Theodore Christiansen, tried, convicted of murder in the second degree and sentenced to a term of 60 years in the state penitentiary as authorized by section 690.3, Code, 1962. His appeal assigns error in admitting in evidence oral and written confessions made by him. We find no merit in the appeal and affirm the conviction.

Defendant asserts the confessions were inadmissible because made when he was without assistance of counsel, were not voluntary but induced by such cruel and inhuman treatment of him as to overcome his power of resistance and by fear for his life and safety from the sadistic and inhuman acts of a Tennessee sheriff.

The deceased, age 48, lived with his mother in Sioux City. She last saw him alive Friday afternoon, July 10, 1964, when he left home with his truck and said he would return Sunday morning. Sioux City police officers and Sheriff Scholer of Plymouth County found his truck and decomposed, naked body July 23 in a small clearing surrounded by high weeds near the Floyd River, over the line in Plymouth County which adjoins Sioux City on

the north. His clothing and billfold, without money or identification, were lying nearby. Except for the condition of the billfold foul play was not suspected as the cause of death and the body was buried.

Between two and three a.m. on August 5 defendant and an accomplice named McCartt were arrested in the act of burglarizing a store in Tennessee and two sheriff's deputies took them to the county jail where they were still lodged on August 11. About noon on that day defendant sent this letter (exhibit 12), written by him, to the sheriff who lived below the jail:

"Jack, I would like for you to call me down stare's so I can talk to you. I killed a man in Sioux City, Iowa. It wasn't in the city, it was about 10 miles out of town. I don't know if the police have found the body yet but I can tell them where it is at. You could place a long distance call to the police there and find out all about it. If you will call me down stares I will tell you all about and also, where the gun is that I used. Thanks. /s/ James Louis Holland"

Upon receipt of the letter Sheriff Laxton phoned Assistant State Attorney General Carson but was unable to reach him. He then called County Judge Sexton, formerly a practicing attorney, who came to the jail and talked to defendant in the presence of the sheriff. Judge Sexton first read exhibit 12, then told defendant who he was, that he (defendant) did not have to make any statement, if he did make one it could be used against him in court, and if he wanted a lawyer they would get him one. Defendant replied he did not want a lawyer and wanted to make the statement to get the matter off his mind. Defendant then related how he killed the man near Sioux City. Judge Sexton reported this conversation by phone to the sheriff at Sioux City and then returned to the courthouse.

About two hours later Assistant Attorney General Carson came to the jail, read exhibit 12, told defendant he was under no charge in Tennessee for any happening in Iowa, he did not have to make any statement, his failure to do so would not be an admission against him, if he did make a statement as to what happened in Iowa it would probably be used against him, he was entitled to a lawyer and the official would have one appointed

before he made any statement. Defendant replied he did not want a lawyer. He then freely confessed to Mr. Carson how he killed the deceased, Carson reduced the statement to writing, read it to defendant and handed it to him to read, defendant added two short paragraphs and signed the statement. It was received in evidence as exhibit 11.

In addition to the advice given by Judge Sexton and Mr. Carson as to defendant's right to counsel, to remain silent and that any statement he made might be used against him, Sheriff Laxton gave defendant similar advice and warning before he made any statement to Judge Sexton. No one had interrogated defendant. There is no evidence any threats, promises or inducements were made to him. Indeed no one but defendant had any knowledge or well-founded suspicion Christiansen's death was from any unnatural cause until defendant freely told his story in Tennessee.

After the Sioux City police and Plymouth County sheriff were informed of defendant's confession the body of deceased was disinterred on August 12, an autopsy was performed and five .32-caliber bullets were recovered from his body, three from the chest and one each from the abdomen and bowel. An expert gave the cause of death as multiple gunshot wounds.

In the meantime Sheriff Scholer of Plymouth County had telephoned officers at Seminole, Texas, to look for a .32-caliber gun and bullets in a road culvert near there where defendant told the Tennessee officials he concealed them after killing Christiansen. After a short search the Texas officers found the gun and cartridges at the place referred to and they were received in evidence. Defendant obtained the gun, ten rounds of ammunition and a shotgun by burglarizing a residence in Tennessee shortly before he left there to hitchhike to Oregon early in July. Each bullet was imprinted with an "X" which caused more serious bodily injury.

It was on this trip to Oregon that Christiansen was killed. He picked up defendant gave him a ride in his truck from somewhere in Illinois to Sioux City, clear across Iowa. After killing Christiansen defendant took the $15 and identification card from his billfold, reloaded the 32-caliber gun and hitchhiked to San

Antonio, Texas. He eventually reached Oregon where he met McCartt, his accomplice in the August 5 burglary of the store in Tennessee.

Sheriff Scholer and his deputy, Mertes, arrived in Tennessee September 11 to return defendant to Plymouth County. He readily consented to be returned without extradition hearing. It was conceded at the trial the treatment accorded defendant by the Plymouth County officers was of the finest kind and fully in keeping with constitutional concepts in all respects. At the commencement of the trip back to Iowa and many times en route the sheriff advised defendant of his right to counsel and against self-incrimination.

On the morning of September 14 defendant, in the presence of the sheriff and his deputy, talked to the Plymouth County attorney who first advised him again of his pertinent constitutional rights. Defendant again said he did not need or want an attorney, was tired of running and wanted to get it over with. He was shown the confession, exhibit 11, asked to read it, he said he knew what was in it and reaffirmed it. He expressly so testified at the trial, also that he was tired of being informed of his right to an attorney because he just did not want one.

Before defendant's oral admissions or confessions or the writings exhibits 11 and 12 were offered in evidence, the trial court held an extended hearing in the jury's absence to determine whether they were voluntary and admissible. Both sides joined in requesting the hearing. Defendant also asked that all witnesses be excluded from the hearing except while testifying and that prospective witnesses refrain from discussing the testimony with witnesses who had testified. This request was granted and witnesses were duly admonished.

At the conclusion of the hearing the trial court filed detailed Findings of Fact, Conclusions of Law and Rulings which fill 24 pages of the record. They reveal careful consideration of the questions presented and familiarity with recent decisions bearing thereon. The court held none of the confessions or admissions of defendant was the result of any improper treatment or involuntary, that defendant was advised of all his rights, including his right to counsel, he refused counsel, and that exhibits 11 and

12 and the oral confessions to Judge Sexton, Assistant Attorney General Carson and the Plymouth County attorney should all be admitted in evidence. Abundant evidence supports the above Findings, Conclusions and Rulings and very little testimony is contrary to them.

We first consider whether receipt in evidence of defendant's admissions and confessions was error on the ground he was without counsel when they were made. If we assume, without so deciding, that defendant must first have been advised of his right to counsel without requesting one, in order to render his incriminating statements admissible, the evidence is almost conclusive that such advice was effectively and repeatedly given, was rejected and defendant intelligently waived any right he had to consult with counsel before voluntarily confessing the crime charged.

Defendant himself testified he knew either Judge Sexton or Mr. Carson would have an attorney appointed for him if he wanted one but he did not want one. Also that he knew he could have an attorney on September 14 when he reaffirmed, to the Plymouth County officials, his confession exhibit 11. Defendant had the equivalent of an eleventh grade education although it was obtained in a boys training school and a penitentiary. He had a criminal record of long standing. There is no evidence he was not fully aware, without being so advised, of his right to counsel and against self-incrimination.

No decision has come to our attention which supports the view that these inculpatory statements, under such circumstances as we have here, were inadmissible as a matter of law. Gideon v. Wainwright, 372 U. S. 335, 83 S. Ct. 792, 9 L. Ed.2d 799, 93 A. L. R.2d 733, and Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed.2d 977 (a 5-to-4 decision), cited by defendant are not in point.

Gideon, an indigent, asked the trial court to appoint counsel to represent him on the trial and was told Florida law made no provision for such appointment in his case. Escobedo, while in custody of the police and under persistent interrogation by them, repeatedly asked to confer with his lawyer who was in the building, the lawyer made like requests to the police, and all such

requests were denied. The accused was also not advised of his right to remain silent. Other circumstances also pointed to the involuntary character of the confession. Nothing of the kind appears here.

We note that most lower federal courts and state courts have usually applied the rule of the Escobedo case only where the facts are comparable. Among such decisions are People v. Hartgraves, 31 Ill.2d 375, 202 N.E.2d 33; Sturgis v. State, 235 Md. 343, 201 A.2d 681; State v. Scanlon, 84 N. J. Super. 427, 202 A.2d 448, 453, 454; Commonwealth .ex rel. Linde v. Maroney, 416 Pa. 331, 206 A.2d 288; Browne v. State, 24 Wis.2d 491, 129 N.W.2d 175, 131 N.W.2d 169, certiorari denied 379 U. S. 1004, 85 S. Ct. 730, 13 L. Ed.2d 706; State ex rel. Goodchild v. Burke, 27 Wis.2d 244, 133 N.W.2d 753, 758. See also State v. Fox, 257 Iowa 174, 178, 131 N.W.2d 684, 686. Contra are People v. Dorado, 62 Cal.2d 338, 42 Cal. Rptr. 169, 398 P.2d 361; State v. Neely, 239 Ore. 487, 395 P.2d 557.

People v. Dorado, supra, is a 4-to-3 decision which, as State ex rel. Goodchild v. Burke, supra, points out (at page 759), goes further than any pronouncement of the United States Supreme Court. Even the Dorado case is distinguishable from the present one since Dorado was not advised of his right to counsel and could hardly waive a right not known. Here, as pointed out, Holland was so advised and knowingly waived any right he had to counsel. The Dorado opinion properly recognizes that the Escobedo decision permits an accused to waive counsel (at page 178 of 42 Cal. Rptr., page 371 of 398 P.2d).

 We next consider whether defendant's incriminating statements were inadmissible in evidence on the ground they were involuntary because induced by cruel and inhuman treatment. Defendant testified he was not physically abused or threatened in any way by the Tennessee sheriff or deputies. He did testify a former sheriff struck him when he was confined in the same jail eight years earlier. Defendant claims his statements were induced by cruel treatment of other prisoners in the jail and his fear he might be subjected to like treatment.

Defendant was confined in a cell, 8 by 10 feet, with his accomplice McCartt. The sheriff testified this was done only after

it was reported they intended to break jail and hacksaw blades were found in the part of the jail they occupied. McCartt had previously broken out of this same jail. The sheriff admitted he slapped McCartt on one occasion in defendant's presence. Provocation for this and severity of the beating are in dispute. The sheriff said McCartt had broken some bottles in or near the cell and McCartt refused to help clean them up by telling the witness "No s-o-b is going to tell me what to do." The invidious term was not abbreviated. McCartt's use of the quoted language stands undenied. Defendant did testify it was a different kind of mess McCartt was asked to help clean up and that he was much more severely beaten than by one slapping.

Defendant also testified he saw the sheriff severely beat another prisoner for throwing a salt shaker out the jail window which cracked the windshield of the stolen automobile McCartt and defendant were accused of driving. The sheriff denied he struck any prisoner other than McCartt. Defendant further said he learned of, but did not see, a deputy sheriff strike a third prisoner.

There is evidence the FBI investigated a complaint of beatings in the jail and reported the investigation had been terminated without action being required; also that defendant told Assistant Attorney General Carson on August 11 the sheriff had been treating him O.K.

Aside from the above testimony there is evidence of unsanitary conditions in the jail. Defendant first testified the four toilets in the jail were out of order but later admitted this was not always true, that he and his cellmate had the use of a toilet in working order and that the floor of their cell was clean. The sheriff admitted two of the four toilets were out of order during part of defendant's confinement but said they were plainly so marked. He contended the prisoners stopped up the toilets.

The trial court considered all the testimony bearing on the voluntary character of defendant's incriminating statements and concluded they were voluntary and receivable in evidence before the jury. As before indicated, we find no error in the ruling. At least part of defendant's testimony that his confessions were the result of cruelty to other prisoners and unsanitary conditions

in the jail was elicited by leading questions from his counsel. Few if any appeals have come to us in recent years with such a persuasive showing of the voluntary nature of admissions and confessions of an accused.

The present case is a far cry from State v. Archer, 244 Iowa 1045, 58 N.W.2d 44, only Iowa decision cited, Watts v. Indiana, 338 U. S. 49, 69 S. Ct. 1347, 93 L. Ed. 1801 (also cited in Archer), and other supreme court cases called to our attention. In general, the confession held inadmissible in the cited precedents was extracted from an unwilling defendant after prolonged interrogation over a considerable time by enforcement officers, frequently in relays, determined to procure a confession to support the theory of a crime held by the inquisitors. See discussion of opinion of Justice Jackson in Gallegos v. Nebraska, 342 U. S. 55, 71, 72, S. Ct. 141, 150, 96 L. Ed. 86, found in State v. Archer, supra, 244 Iowa 1045, 1059, 58 N.W.2d 44, 51. Nothing of the kind appears here.

As we have indicated, no official in either Tennessee or Iowa knew or suspected Christiansen was murdered, much less that defendant committed the crime. No one had any theory as to the offense Holland committed and, of course, could not have sought to obtain a confession to support a nonexistent theory. Further, the Tennessee officials had little if any incentive to resort to improper means to induce defendant to confess a crime committed in Iowa or to obtain a conviction therefor. It is reasonable to believe the testimony of Mr. Carson that his only purpose was to take what statement defendant wanted to make. Also, if it were true that defendant feared cruel treatment by the Tennessee sheriff or was distressed over alleged unsanitary conditions in his jail, any cause for such concern ended when the Iowa sheriff took defendant into custody before he again confessed the crime.

We believe we should express our opinion on the procedure in the trial court to determine the question of voluntariness of defendant's confessions and their admissibility in evidence. As stated, the court held an extended hearing in the jury's absence to determine these questions and at its conclusion filed detailed Findings of Fact, Conclusions of Law and Rulings thereon. This seems to be strictly in accord with procedure which

received the blessing of the supreme court, on considerations of due process of law, in Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed.2d 908, 1 A. L. R.3d 1205. We therefore approve the procedure used here.

We note that after the trial court ruled the confessions were admissible and they were received in evidence before the jury, testimony was again admitted as to their voluntary character. It was proper to do this, not to permit the jury again to pass upon their admissibility—that had been properly determined by the court—but as bearing upon the weight to be accorded them and the credibility of the witnesses who testified regarding the confessions. State v. Faught, 254 Iowa 1124, 1129–1133, 120 N.W.2d 426, 429–431 (Division II of opinion), seems to have application although the evidence there held to be admissible on the question of weight to be given confessions related to defendant's mentally retarded condition rather than their voluntary character.

Our approval of the procedure used here is in accord with the view of both the Wisconsin and Michigan courts in approving the so-called "orthodox" over the "Massachusetts" method of determining the question of voluntariness. State ex rel. Goodchild v. Burke, supra, 27 Wis.2d 244, 133 N.W.2d 753, 759–764; People v. Walker, 374 Mich. 331, 132 N.W.2d 87, 91. See also State v. Taylor, 270 Minn. 333, 133 N.W.2d 828, 832. The orthodox rule is also favored by most scholars (page 763 of the Goodchild opinion, supra). Jackson v. Denno approves both procedures and apparently leaves the states free to choose between them.

The principal difference between the two procedures is that under the Massachusetts rule, after the court has determined the confession was voluntary, if he does so, the question is again submitted to the jury for its determination. Thus, in a sense, the jury is permitted to second-guess the court on this question. Under the orthodox rule the court's determination of admissibility is final. Of course, if the court determines the confession was involuntary, it is excluded and does not go before the jury. See comment on Jackson v. Denno in 50 Iowa Law Review 909–917.

The question of sufficiency of the evidence to support the

conviction is not raised. There is little doubt on this score. At the trial defendant claimed he acted in self-defense in killing Christiansen. He did not make this claim in his pretrial statements. The confession (exhibit 11) states "he fell down on the first shot and the other shots were fired after he fell down." Five, perhaps six, shots were fired in all. Deceased was not armed; defendant was an expert in the use of firearms.

We find no ground for disturbing the judgment.—Affirmed.

All JUSTICES concur except JUSTICE BECKER, who concurs specially.

BECKER, J.—I concur in the result. I dissent from dicta expressed in the first four of the last six paragraphs of the majority opinion. The majority states that we should express our opinions on procedure to determine the question of voluntariness of defendant's confession and admissibility of evidence. To this extent I concur, and I concur in what precedes those paragraphs.

I. I do not concur in material which analyzes the record in this case nor do I concur in adoption of the orthodox rule. Denno approves both the orthodox procedure and the Massachusetts procedure re voluntariness of confessions, distinguishing the two as follows: "In jurisdictions following the orthodox rule, under which the judge himself solely and finally determines the voluntariness of the confession, or those following the Massachusetts procedure, under which the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused, * * *." Jackson v. Denno, 378 U. S. 368, 378, 84 S. Ct. 1774, 1781, 12 L. Ed.2d 908, 916, 1 A. L. R.3d 1205, 1214.

After extended hearing and careful findings the trial court instructed:

"Instruction 20. A written statement which the State claims defendant, James Lewis Holland, gave to officers has been offered in evidence, relating to the matters now charged by the State.

"Now, this document purports to be a statement relating to acts committed by defendant, and you are instructed that the

law so guards the rights of persons accused of crime that such a statement cannot be considered unless the State proves by the evidence beyond a reasonable doubt that the same was given by defendant voluntarily, that is, without fear, promises, or deception, and with knowledge of the contents of the document.

"If the State has not sustained its burden of proof with respect to this document, then you must disregard it. On the other hand, if the State has sustained its burden, then you may give the document great weight as to matters therein recited, but the weight to be given is for you to determine. However, under our law such a statement will not warrant a conviction unless accompanied by other proof that the offense charged was committed."

We are not concerned with the sufficiency of the instruction. We are concerned with what it does. I believe it again submits the issue of voluntariness to the jury in substantial conformance with the Massachusetts rule.

Thus the majority approves use of the Massachusetts rule in this case but approves the orthodox rule for the future. The confusion is compounded.

II. More important is objection to acceptance by the majority of the orthodox rule supported by citation of State ex rel. Goodchild v. Burke, 27 Wis.2d 244, 133 N.W.2d 753; People v. Walker, 374 Mich. 331, 132 N.W.2d 87.

Many states are choosing between the procedures. The rationale of each group is best expressed by the following quotations:

"If we arrogate to the trial judge the right to adjudicate voluntariness, even though that question involves issues of fact, we find no basis in logic in submitting the same question over again to the jury to second-guess him." (Emphasis supplied.) People v. Walker, 374 Mich. 331, 337, 132 N.W.2d 87, 91. Decision: to follow the orthodox rule.

"The orthodox rule is generally recommended by legal scholars, and has been approved by the Supreme Court of the United States. The Massachusetts rule, however, appeals to us as the better rule because by allowing the jury also to pass on the issue of voluntariness, it preserves to the defendant his right to a jury

*trial on this critical issue.* The Supreme Court of the United States has also indicated in Jackson v. Denno, supra, its approval of the Massachusetts rule." (Emphasis supplied.) State v. Brewton, 238 Ore. 590, 601, 395 P.2d 874, 879. Decision: to follow Massachusetts rule.

Quotation of the foregoing opposing rationale would seem to be sufficient to point the way for this court. The "second guessing" concept seems out of place in such a grave matter. The function of the jury is to resolve issues of fact. This function should not be taken from it because constitutional rights require a preliminary finding by the court for the purpose of the admissibility of the evidence in the first instance.

State v. Tharp is currently under consideration here (now published, 258 Iowa 224, 138 N.W.2d 78). There the trial judge also submitted alleged confessions under the Massachusetts rule. It is interesting to note that two competent conscientious trial judges (without referring to the rule by name) adopted the Massachusetts rule as the procedure which would most fairly effectuate justice.

I would affirm the trial court's procedures in this case as submission under the Massachusetts rule and approve that procedure for future use in this state.