**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ming Wan LEUNG, et al.,
Defendants–Appellants.**

Nos. 90–2325, 90–2326, 90–2359,
& 90–2495.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1991.

Decided April 11, 1991.

Rehearing and Rehearing In Banc
Denied May 9, 1991.

---

Daniel C. Murray, Morris Pasqual, Barry R. Elden, Asst. U.S. Attys., Office of the

U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Richard W. Levitt, Joel B. Rudin, Mass & Rudin, New York City, Marc M. Barnett, Oak Lawn, Ill., Alan S. Nagel, Grodner & Nagel, Chicago, Ill., for defendants-appellants.

Before COFFEY and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Long before the modern craze for cocaine, there was a flourishing opium trade in the Orient. Patterns formed a hundred years ago survive many changes in enforcement policy. The predictability of unpredictability helped ensnare one cell of a larger enterprise.

A syndicate in New York ordered 45 kilograms (about 100 pounds) of 83% pure white heroin from Thailand. Delivery was to occur in Chicago, where the buyers would pay the courier $10,000 for his efforts. Neither the sellers nor the buyers trust their agents in a deal of this magnitude. Payment for the shipment occurred between the principals. The Thai courier was to produce a 20 baht note (the baht is the unit of Thai currency, worth 4¢) with a serial number ending in '01, receiving the bill two digits higher. Each side was to deliver the note to its principals, confirming the exchange. The buyer's agents would bring back the heroin, the best proof of faithful service. What would happen to the seller's agent if he reappeared without either the heroin or the '03 note is too grisly to contemplate.

The Thailand National Police got wind of this impending transaction and alerted the Drug Enforcement Agency. One way or another (the record does not reveal how, probably to protect the health of those involved) a DEA agent was substituted for the original Thai courier. Agent Hoang Ly, posing as the courier, checked into a Ramada Inn near O'Hare Airport in Chicago and called New York to notify the buyer. Sa Mei Chen answered the phone. Ly asked for "Khooi", the arranged code, and introduced himself as "Mooshoo", the courier's code name. Sa asked Ly to make the delivery in New York. Ly declined, and the two agreed to talk in a few hours when someone who spoke English better than Sa would be available. The next time Ly called, Sa turned the phone over to Lau Ching Chin. After asking Ly whether he had the "lucky money", Lau told Ly that "her friends" would pick up the heroin at noon the next day. She told Ly that the $10,000 fee would be "no problem" and that he should expect to deliver the heroin to two Chinese.

Ly briefed the other DEA agents about what to expect during the pickup. Based on his 23 years of experience in the oriental heroin trade, Ly told the agents that the Chinese would appear before the agreed pickup time, and that more than two would come. The leader, Ly thought, would linger in the background directing operations. Expecting the unexpected, the agents planted themselves around the hotel to watch and pounce.

Sa and Lau appeared in the lobby of the Ramada Inn between 3:00 a.m. and 3:45 a.m. the next day to reconnoiter. Lau called Ly's room at 4:00 a.m. to say that the pickup would be made presently. As instructed, Ly went to the lobby at 4:45 a.m. and exchanged code names with Sa, who conducted Ly to a blue Honda in the parking lot. Sa said that he had driven from New York to Chicago in this car and would use it to return the heroin. Next stop was Ly's room, where Sa paid the $10,000 and received the key to a locker containing the heroin. Sa told Ly that for the next delivery they would use 20 baht notes ending in '02 and '04. Ly called for a porter to move the locker to the car. This was the signal for the other agents, who closed in. Sa jumped out the window but was nabbed in the parking lot before he could reach the car. The agents fanned out to find Sa's confederates.

Agent Kirk Meyer took part in the hunt. He examined the car and saw a walkie-talkie on the dashboard. Shortly before 6:00 a.m., perhaps half an hour after Sa's capture, Meyer walked into a coffee shop

across the street from the Ramada Inn. He found an Asian man staring intently at the motel. From this vantage point one could see the main entrance and the door opening on the parking lot, but not the blue Honda. Between the man's legs was a bag, from which a stubby black antenna protruded. Meyer identified himself as an officer and asked the man for identification. He replied in broken English that he is Thai and had no identification. Meyer began to speak to the man in Thai. On hearing Thai spoken, the man began to perspire; his eyes opened wide, his hands started to shake, and he rocked back on his heels. He lapsed into silence. Unsuccessful in his attempts to communicate in Thai, Meyer reverted to English. The man then admitted he is Chinese, and Meyer arrested him. He is Han Ming Li, and the contents of the bag were used in evidence against him.

Still seeking Lau and any additional members of the team, the agents started canvassing nearby hotels. Agent Meyer arrived at a Holiday Inn about 7:00 a.m. and learned from the night manager that an Asian woman and two Asian men had checked into the hotel at about 3:00 a.m., arriving without reservations or luggage. Meyer and Agent Jeffrey Stickney accompanied one of the motel's housekeepers to these rooms. The housekeeper knocked on the doors and said that she wanted to clean. A woman opened one of the doors. Agent Meyer recognized the woman (who turned out to be Lau) as one of the pair who had reconnoitered the lobby of the Ramada Inn. He yelled: "That's her". Lau tried to slam the door, but the agents barged in. Lau appeared to faint, but the agents were not distracted. Stickney saw a shadow in the curtain and looked out the door leading to the balcony. He espied a man (Ming Wan Leung) on construction scaffolding trying to escape. Meyer followed Ming onto the scaffolding and, with help from other agents, returned him to the room. The agents searched the room and found $102,000 in cash, a mobile phone, a pager, and notes containing the telephone number of a hotel in Bangkok and the information Ly had provided over the phone. An agent asked Lau how much money there was; Ming replied "$100,000".

Other incriminating evidence turned up, but the details are unimportant. Ming, Sa, Han, and Lau were indicted for conspiring to possess and distribute heroin, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, and for traveling in interstate commerce with the intent to transact illegal business, in violation of 18 U.S.C. § 1952. Three pleaded guilty before the end of the trial. Ming, who was convicted by the jury, does not challenge the sufficiency of the evidence against him. They received terms under the Sentencing Guidelines between 121 months (Han) and 293 months (Ming, whose sentence was enhanced for a leadership role).

The principal arguments of all four defendants concern the arrests, searches, and statements. Some of the defendants preserved their arguments, and others say that their lawyers were incompetent in failing to do so. It is simple to resolve the search, seizure, and interrogation questions on the merits, and we accordingly do not decide whether the attack on the performance of counsel would be a sufficient way to smuggle these issues through the back door. What the defendants characterize as unconstitutional arrests and interrogations appear to us to be models for other agents to follow. At each step the agents acted professionally, with ample foundation and within the bounds set by the Constitution.

▮▮▮ Sa was caught in flight. Both he and his car could be searched following the arrest. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). What agent Meyer saw in the car provided an important strand in the net that ensnared Han, whom Meyer discovered watching the Ramada Inn. A lookout was inevitable in a transaction of this size, and the sentry would need a way to communicate with others—the walkie-talkie. Han was in a position to watch the principal entrances to the motel. Either the appearance of agents or a commotion would have allowed a person sitting where Han was to alert the

others. (Unfortunately for the buyers, the agents were already inside the motel expecting an early arrival.) Han insists that for all Meyer knew he was an innocent bystander, sipping tea while watching the sunrise. Yet Meyer knew that Han was in a lookout's position and possessed a lookout's gear. Han's attention was fixed on the Ramada Inn. When asked his nationality, Han lied. What happened next must have confirmed Han's worst fear: an occidental who has identified himself as an agent starts speaking Thai. That could occur only if something had gone wrong with the delivery. Han reacted with shock and fear. When he admitted being Chinese, Han not only revealed his lie (why would a Chinese say he is Thai?) but also linked himself to Sa and Lau. Probable cause is a practical concept, *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Chaidez*, 919 F.2d 1193, 1199 (7th Cir.1990), and by the time Han conceded his nationality (if not before) Meyer had probable cause to arrest him. Everything Han did is consistent with membership in the buyers' team; very little he did is consistent with being a bystander. The agent was entitled to seize and search Han's bag incident to the arrest, and its contents could be used in evidence. We reach this conclusion without deciding the extent to which an appellate court should defer to the district judge's decisions concerning probable cause and the reasonableness of a search, a subject under discussion in this circuit. See *Chaidez*, 919 F.2d at 1196; *United States v. McKinney*, 919 F.2d 405 (7th Cir. 1990); *United States v. Malin*, 908 F.2d 163, 169–70 (7th Cir.1990) (concurring opinion).

▇▇▇ The arrest entry at the Holiday Inn was eminently reasonable too. Ly's experience told the agents that there would be more than two Chinese. A woman (Lau) had been seen in the lobby but was at large. Knowledge that a group of Asians, including a woman, arrived unexpectedly and without luggage at 3:00 a.m. at a Holiday Inn justified further investigation. The agents used a ruse: a housekeeper knocked on the door, and Lau's visage provided probable cause to believe that the occupants of the room were involved in the heroin deal. Police may use ruses to obtain entry, provided they do not exceed the scope of the consent. *United States v. Scherer*, 673 F.2d 176, 182 (7th Cir.1982). As things turned out, no one, not even the housekeeper, entered the room until probable cause had been established. All the agents got from the ruse was a look at Lau's face, which she willingly exposed. The tactics respected the privacy interests of the occupants, who could have elected not to answer the knock on the door. If someone other than Lau had opened the door, the agents would have departed, leaving the occupants undisturbed (and with a cleaner room). Innocent persons would have been fully protected; the agents' tactics were a threat only to the guilty.

Having recognized Lau as the person who toured the lobby of the Ramada Inn, the agents had probable cause to make an arrest. Lau maintains that because she retreated and slammed the door, the agents had to halt and obtain a warrant. Not so. Passing the threshold does not cut off the agents' ability to follow. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). If, despite *Santana*, following a person inside sometimes requires a warrant, *United States v. Berkowitz*, 927 F.2d 1376, 1385–88 (7th Cir.1991), exigent circumstances make warrantless action on probable cause reasonable. These circumstances were exigent. Once the agents arrested Sa, it was only a matter of time before the others, expecting and not receiving a message, fled. The agents did not know where these others could be found, even who they were. There was nothing to do but beat the bushes, which the agents did. Having found whom they sought, they could not tarry. As Ming's flight shows, the suspects could have escaped out the back while agents guarded the front. Who could have known what evidence would have been destroyed had the agents been able to barricade the doors to the room while sending for a warrant? These agents were hot on the trail and acted reasonably.

Once inside the room, the agents were entitled to make a protective sweep, *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), which would have revealed Ming's presence even if agent Stickney had not seen Ming's shadow. The items the agents seized were all within Lau's reach, making their seizure reasonable. Most of the questions the agents asked, before they gave *Miranda* warnings, sought routine information that is outside *Miranda's* scope. *Pennsylvania v. Muniz*, 110 S.Ct. 2638, 2650 & n. 14 (1990). We need not decide whether the query about the amount of money was a routine booking question (designed to protect the officers from a claim that they pilfered some of the cash before turning in the rest for inventory). The agents asked Lau, believing that she is the only one who speaks English; Ming leaped in with the answer. Ming was not under interrogation, see *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980), and information he volunteered was properly admitted.

Most of the defendants' remaining arguments ask us to review discretionary decisions the district judge made during trial or in the course of sentencing. The deferential standard of review dooms these arguments, which we do not discuss separately. For example, Lau contends that the court should have given her fourth attorney more time to prepare for the sentencing proceeding. But the court postponed the sentencing twice at the request of her third lawyer, and the judge allowed both the third and fourth to present arguments at sentencing. Lau's attempt to paint this as a deprivation of the right to counsel (the fourth lawyer, she says, needed more time to be effective) is unavailing. The last we need address is Ming's contention that the court admitted hearsay over his objection.

Agent Ly told his colleagues that Chinese heroin dealers work in groups, with one leading from the rear. Ly testified about his role in these events and also told the jury about his experience concerning group operations. After his testimony, Ly returned to Thailand. Meyer recalled, during redirect testimony, that Ly also told the agents where they would find the leader. Ming's lawyer objected on grounds of hearsay. The district court overruled this objection, remarking that Han's lawyer had opened the door during cross-examination of agent Meyer. (Han did not plead guilty until the close of the government's case.) This ruling was unresponsive to the objection. Cross-examination may indeed "open the door" to a subject on redirect, but it does not authorize the use of evidence violating another rule, such as the complex of rules limiting hearsay. That a particular subject is fair game says nothing about how the subject is to be proved. On appeal the prosecutor argues that the testimony was offered not for its truth but to show why agent Meyer conducted the investigation as he did. That avoids the hearsay problem at the expense of making the testimony irrelevant—at least, irrelevant to guilt, as opposed to a motion to suppress. Ming did not have a motion to suppress outstanding, and the district judge did not give a limiting instruction.

Although the admission of this testimony was error, it was also harmless. The jury was not being called on to determine whether Ming was a "leader", the only respect in which Meyer's hearsay supplemented Ly's direct testimony. The district judge had to determine in sentencing whether Ming was a leader, but the hearsay rules do not apply to sentencing, Fed. R.Evid. 1101(d)(3), so the use of the testimony after trial is not objectionable. The evidence against Ming, as against the others, was overwhelming. Although the prosecutor referred to this bit of hearsay during closing argument, we are confident that it did not have substantial influence on the course of the trial, see *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986); *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Ming's case has been hopeless since the moment of his arrest.

AFFIRMED